1
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     UNITED STATES OF AMERICA,      )  File No. 18-cr-311
4                                   )          (ADM/LIB)
            Plaintiff,              )
5                                   )
     vs.                            )  Saint Paul, Minnesota
6                                   )  February 11, 2019
     Craig Steven Jackson, Jr. (2), )  2:00 p.m.
7    Jatwain Martez Williams (4),   )
                                    )
8                                   )
            Defendants.             )
9    ------------------------------------------------------------

10           BEFORE THE HONORABLE LEO I. BRISBOIS
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                **(ARRAIGNMENT and MOTIONS HEARING)**

12   APPEARANCES
      For the Plaintiff:         UNITED STATES ATTORNEY
13                               DEIDRE Y. AANSTAD, AUSA
                                 300 South Fourth Street
14                               Suite 600
                                 Minneapolis, Minnesota 55415
15
      For Defendant Jackson:     CHESTNUT CAMBRONNE, PA
16                               BRIAN TODER, ESQ.
                                 17 Washington Avenue North
17                               Suite 300
                                 Minneapolis, Minnesota
18                               55401-2048

19    For Defendant Williams:    RIVERS LAW FIRM, PA
                                 BRUCE M. RIVERS, ESQ.
20                               701 4th Avenue South
                                 Suite 300
21                               Minneapolis, Minnesota 55415

22    Transcribed By:            CARLA R. BEBAULT, RMR, CRR, FCRR
                                 Suite 146 U.S. Courthouse
23                               316 North Robert Street
                                 Saint Paul, Minnesota 55101
24

25           Proceedings recorded by mechanical stenography;
      transcript produced by computer.

1                    **I N D E X**

2    GOVERNMENT WITNESSES:                          PAGE
     KRISTOPHER LARSON
3         Direct Examination by Ms. Aanstad          23
          Cross-Examination by Mr. Toder             41
4         Redirect Examination by                    50

5

6    GOVERNMENT EXHIBITS                            REC'D
     Exhibit 1                                       40
7    Exhibit 2                                       40

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  This is the matter of the United States of America versus Dawn Lee Kier, et al, court file 18-cr-311.  The purpose of today's hearing was ostensibly motion practice in all cases, and we have an arraignment to do in one case.

In the case of United States of America versus Aletha Rochelle Pirtle, 18-cr-11 (3), the Defendant filed no motions and indicated to the Court they would not be appearing today.  The Government did file a Motion for Discovery and Production, docket number 55.  There's no defense counsel for Ms. Pirtle, but if the Government representative would note their appearance, I have a question.

MS. AANSTAD:  Good afternoon, Your Honor.  Deidre Aanstad on behalf of the United States.

THE COURT:  And, Ms. Aanstad, you're the Assistant United States Attorney for all four defendant cases, right?

MS. AANSTAD:  Correct, Your Honor.

THE COURT:  Okay.  So your appearance today is for all four defendant cases?

MS. AANSTAD:  Yes, Your Honor.

THE COURT:  All right.  Is your motion docket

1    number 55 still before the Court or is that -- when the

2    Defendant filed no motions, should that have been stricken

3    as well?

4              MS. AANSTAD:  Yes, Your Honor, I apologize.  I

5    will move to withdraw that motion.

6              THE COURT:  All right.  That will be reflected in

7    the minutes.

8              All right.  Then with regard to the case for

9    purposes of arraignment, that's United States of America

10   versus Jatwain Martez Williams, 18-cr-311 (4).  If defense

11   counsel would note their appearance for Mr. Williams,

12   please.

13             MR. RIVERS:  Bruce Rivers on behalf of

14   Mr. Williams who is present and to my right, Your Honor.

15             THE COURT:  All right.  And Mr. Williams, I

16   received a letter last week, I think it was on the 5th,

17   docket numbers 75 through 80 were the defense motions.  They

18   have been withdrawn, correct?

19             MR. RIVERS:  Yes, Your Honor.

20             THE COURT:  All right.  And Ms. Aanstad, docket

21   number 56 was the Government's Motion for Discovery directed

22   at Mr.  Williams.  Should that have been withdrawn as well?

23             MS. AANSTAD:  Yes, Your Honor.  The Government

24   would move to withdraw it.

25             THE COURT:  All right.  So that will be withdrawn

1    in the minute entries today.

2            All right.  Then Mr. Williams, if you and

3    Mr. Rivers would come to the podium, please.

4            Mr. Williams, for the record, could you state your

5    full name, include your middle name and spell your last

6    name.

7            DEFENDANT WILLIAMS:  Jatwain Martez Williams,

8    W-i-l-l-i-a-m-s.

9            THE COURT:  And Mr. Williams, also for the record,

10   could you state your date of birth?

11           DEFENDANT WILLIAMS:  11-08-96.

12           THE COURT:  Mr. Williams, an indictment was filed

13   against you on or about January 18th, 2019.  You have a

14   right to have that document read into the record in its

15   entirety or you can waive the reading.  The choice is yours.

16   What would you like to do?

17           DEFENDANT WILLIAMS:  Waive it.

18           THE COURT:  The record may reflect that

19   Mr. Williams has waived the reading of the indictment.  Then

20   at this time, sir, as to the counts in the indictment

21   arrayed against you, how do you plead?

22           DEFENDANT WILLIAMS:  Not guilty.

23           THE COURT:  Pleas of not guilty will be entered on

24   the record on behalf of Mr. Williams as to all counts in the

25   indictment arrayed against him.

1          Anything from the Government with regard to the

2     arraignment?

3          MS. AANSTAD:  No, Your Honor.

4          THE COURT:  Mr. Rivers, anything further from the

5     defense with regard to the arraignment?

6          MR. RIVERS:  No, Your Honor.

7          THE COURT:  Ms. Aanstad, is there any reason, in

8     light of the withdrawal of the motion, that Mr. Rivers and

9     Mr. Williams need to remain?

10          MS. AANSTAD:  No, Your Honor.

11          THE COURT:  Mr. Rivers, any reason why you would

12     need to remain?

13          MR. RIVERS:  Other than to learn from Mr. Toder,

14     no.

15          THE COURT:  That's entirely voluntary and that's

16     what I mean.  But it's entirely up to you and Mr. Williams

17     whether you want to stay or go, but we've concluded our

18     business for today.

19          MR. RIVERS:  Thank you.

20          THE COURT:  All right.  Thank you.

21          With regard to United States of America versus

22     Dawn Lee Kier, 18-cr-311 (1), the Court received a letter

23     from defense counsel Mr. Aligada indicating that the defense

24     motions he desired to be submitted on the papers and that

25     the Defendant and her counsel's appearance be excused.  The

1    Court granted that request.

2              Ms. Aanstad, do you have docket number 53, which

3    is the Government's motion directed at Defendant Kier?  Are

4    you submitting that to the Court on the papers as well?

5              MS. AANSTAD:  Yes, Your Honor.

6              THE COURT:  All right.  All right.  That then

7    leaves Motions for Discovery and Production of Evidence, and

8    two potential motions subject to a report and recommendation

9    in the matter of the United States of America versus Craig

10   Steven Jackson, Jr., 18-cr-311 (2).  Would counsel for

11   Mr. Jackson please note your appearances.

12             MR. TODER:  Good morning, Your Honor.  Brian Toder

13   on behalf of Mr. Jackson who is present.

14             THE COURT:  All right.  Let me work a little bit

15   backwards.  It appears from the materials that have been

16   submitted based on my review of those before today that

17   docket number 68, Defendant's Motion to Suppress Evidence of

18   Electronic Surveillance, is moot.  Have I got that right?

19             MR. TODER:  Yes, Your Honor.

20             THE COURT:  So counsel can agree on the record

21   here before the Court that that can be withdrawn?

22             MR. TODER:  Yes, Your Honor.

23             MS. AANSTAD:  Yes, Your Honor.

24             THE COURT:  All right.  So that would leave one

25   motion subject to potential report and recommendation.  That

1    would be docket number 66, Defendant Jackson's Motion to

2    Suppress Statements.  Motion papers refer to April 12th,

3    2018.  Is that motion still before the Court?

4              MR. TODER:  It is, Your Honor.

5              THE COURT:  Okay.  And there's going to be

6    testimony and evidence?

7              MS. AANSTAD:  Yes, Your Honor, if I may?

8              THE COURT:  Yeah.

9              MS. AANSTAD:  Your Honor, I advised the Court

10   staff earlier today, and I'd advised Mr. Toder last

11   Wednesday when the motions hearing was continued from last

12   Wednesday to today, that the Court -- or excuse me -- the

13   Government had indicated that the investigator or Special

14   Agent Daniel Skoog from the Becker County Sheriff's Office

15   would be testifying to the statement that was obtained from

16   the Defendant on April 12th, 2018.  However, Agent Skoog was

17   unable to be here today and there was another officer that

18   was in the room during the course of the statement and

19   participated in the interview with the Defendant on April

20   12th of 2018.  He is here to testify today.  That is

21   Investigator Kristopher, starting with a K, Kristopher

22   Larson from the White Earth Police Department.

23             THE COURT:  All right.  I think what we'll do is

24   we'll hold off on that until we do the discovery motions.

25   But just as long as we're talking about process here,

1    Mr. Toder, Ms. Aanstad, do you expect a briefing period

2    following the hearing on this motion?  I mean, you're

3    welcome to it.  I just want to know what we're --

4              MR. TODER:  I don't know until I hear the

5    testimony, Your Honor.

6              THE COURT:  Okay.  All right.  We'll ask the

7    question again then after we're done.

8              All right.  Mr. Toder, if you and Ms. Aanstad

9    would both come to the podium we'll go through the discovery

10   motions.  I have them.  We have reviewed the written

11   materials.  I'll give you an opportunity to make any

12   additional oral comments that you want to make and then the

13   matters will be submitted subject to order.

14             Docket number 54 is the Defendant's motion for --

15   I'm sorry -- the Government's Motion for Discovery directed

16   at Defendant Jackson.  Mr. Toder, have you had a chance to

17   review that?

18             MR. TODER:  I have, Your Honor.

19             THE COURT:  The reason I ask is there was no

20   written response filed.  Any objections to what the

21   Government is seeking?

22             MR. TODER:  None.

23             THE COURT:  Ms. Aanstad, your motion didn't

24   provide dates for suggested compliance.  Do you leave that

25   to the Court's discretion?

1          MS. AANSTAD:  Yes, Your Honor.

2          THE COURT:  All right.  Docket number 60 is

3    Defendant Jackson's Motion for Mandatory Early Jencks

4    Disclosures.  The Government objects to the Court mandating

5    those, but it looks like from both the written motion and

6    the response from the Government, it appears that the

7    parties have agreed to voluntary exchanges of materials

8    subject to the Jencks Act seven days before trial.  I want

9    to make sure I'm reading everything correctly.  Ms. Aanstad?

10          MS. AANSTAD:  That's correct, Your Honor.

11          THE COURT:  Mr. Toder?

12          MR. TODER:  That's correct, Your Honor.

13          THE COURT:  Okay.  Docket number 51 is Defendant

14   Jackson's Motion for Discovery and Inspection.  Included in

15   there, other than Rule 16 type requests and some other

16   requests, there's also specifically Rule 16(a)(1)(G), expert

17   disclosure requests.  So maybe that seems like that's the

18   area that I might want to hear the most about.

19          MS. AANSTAD:  I apologize, Your Honor, what?

20          THE COURT:  It's docket number 51 and in paragraph

21   5 Defendant Jackson is seeking -- appears to me --

22          MS. AANSTAD:  I don't believe I responded to that.

23          THE COURT:  Yeah, that's what I'm -- there wasn't

24   a written response.

25          MS. AANSTAD:  It was filed earlier; is that

1    correct?

2              THE COURT:  Docket 51 was filed earlier.

3              MS. AANSTAD:  Your Honor, with respect to expert

4    disclosures, I anticipate if this matter were to go to trial

5    the Government would retain or would utilize experts during

6    the course of trial.  I would ask that disclosures be made

7    three weeks prior to trial.

8              THE COURT:  Mr. Toder.

9              MR. TODER:  I believe three weeks is adequate.

10             THE COURT:  Okay.  All right.  Any other aspects

11   of docket number 51 that either party wants to comment on or

12   draw my attention to?

13             MS. AANSTAD:  No, Your Honor.

14             MR. TODER:  No, Your Honor.

15             THE COURT:  Docket number 61 is the defense's

16   motion seeking that the Government provide an early list of

17   its trial witnesses.  But, again, from the materials that I

18   have received, it appears that the parties have reached an

19   agreement outside of these proceedings that that list will

20   be provided 14 days before trial.  Again, am I correct in my

21   assumptions?

22             MS. AANSTAD:  Yes, Your Honor.

23             MR. TODER:  Yes, Your Honor.

24             THE COURT:  Docket number 62 is Defendant

25   Jackson's Motion for Early Disclosure of Post-Conspiracy

1    Statements of Codefendants.  Again, there's reference in the

2    materials submitted that there was a meet and confer and

3    that there's been an agreement that any response materials

4    to this request would be provided 14 days before trial.

5              MR. TODER:  Your Honor, there was, but there's

6    been some modification of that since then.

7              THE COURT:  All right.

8              MR. TODER:  And I understand that the Government

9    is relying on Rule 16 and the Jencks Act as to the timing of

10   whether they have to produce statements of codefendants.

11   However, our theory of the case is, is that Defendant had

12   nothing to do with this conspiracy at all; and to the extent

13   that there are statements there that absolutely do not

14   include even mention of the Defendant, and they normally

15   would had he been part of the conspiracy, we consider those

16   statements as *Brady* material actually, which would trump

17   Rule 16 and the Jencks Act.

18             However -- and I believe the Government disagrees

19   with that but we've worked out something.  The Government,

20   as I recall, has agreed to -- she says that there's three

21   statements out there and those are to be provided now, and I

22   guess they have been or today they will be uploaded on

23   USAfx, so I guess that would solve the problem.

24             THE COURT:  So any statements that are even

25   arguably responsive to your request amount to three, and the

1    parties have agreed to make those available as of today?

2              MR. TODER:  Yes.

3              THE COURT:  Does that make this motion moot?

4              MR. TODER:  Yes.

5              MS. AANSTAD:  If I could add, Your Honor, I simply

6    want to clarify.  First, the Government is agreeing to this;

7    however, disagrees that it is *Brady* material.  These

8    statements -- I typically would not agree to disclose these

9    statements.  They are all statements made to law

10   enforcement.  There's actually more than three statements as

11   I look at it today.  Defendant Pirtle made a series of

12   statements after her arrest on April 12th of 2018.  All

13   statements are being disclosed.

14             THE COURT:  So there's actually more than three?

15             MS. AANSTAD:  Right.

16             THE COURT:  But you're going to produce them all

17   today?

18             MS. AANSTAD:  Producing all statements made by the

19   three codefendants that were made to law enforcement April

20   12th, 2018.  No further statements made by any of the three

21   codefendants after April 12th of 2018.

22             THE COURT:  And your purpose of the record you

23   just made is to make clear that by making that production,

24   you're not giving up on any claim that these are statements

25   made by co-conspirators?

1        MS. AANSTAD:  Correct.

2        THE COURT:  Okay.  So whether or not that may or

3    may not affect admissibility or whatever, that issue is

4    obviously for the trial court at the time of trial.

5        MS. AANSTAD:  That's right.

6        THE COURT:  That's what you're doing?

7        MS. AANSTAD:  Yes.

8        THE COURT:  Okay.  Mr. Toder, do you understand

9    that the production is being made consistent with that

10    representation?

11        MR. TODER:  Yes, Your Honor.

12        THE COURT:  Okay.  So I'll get back to my initial

13    question then.  In light of the agreement that's been placed

14    on the record here and the statement as to the basis of

15    the -- or the reasons for the production and the

16    preservation of its position relative to the

17    characterization of those statements to be produced by the

18    Government later today, is docket number 62 now moot?

19        MR. TODER:  It is, Your Honor.

20        THE COURT:  Okay.

21        MS. AANSTAD:  Your Honor, I have to clarify.  As I

22    indicated to Mr. Toder, I anticipate -- I have assistants

23    working on that over in Minneapolis to get that uploaded to

24    USAfx.  Because they are all audio statements, it does take

25    some time to load them.  So either it will be by the end of

1    today or maybe tomorrow morning when USAfx -- our disclosure

2    is ready to push it out.

3              THE COURT:  Okay.  By in any event, by the end of

4    the day tomorrow Mr. Toder will have access to them?

5              MS. AANSTAD:  I would assume so, yes, Your Honor.

6    According to my assistant, yes.

7              MR. TODER:  And, Your Honor, if I may?

8              THE COURT:  Yes.

9              MR. TODER:  Since we're fine tuning this a little

10   bit, if there are transcripts generated from those, I assume

11   the Government will turn those over as soon as they acquire

12   such transcripts?

13             MS. AANSTAD:  And I will.  There were -- are not

14   transcripts that have been generated at this point in time.

15             THE COURT:  I think Mr. Toder understood that.

16   He's looking forward -- forward looking.

17             MS. AANSTAD:  Yes.

18             THE COURT:  Not looking forward.

19             MS. AANSTAD:  If there are transcripts that are

20   generated --

21             THE COURT:  They will be produced?

22             MS. AANSTAD:  -- we'll disclose those.

23             THE COURT:  All right.  Again, subject to this --

24   it's called a friendly amendment to the agreement -- any

25   reason why docket number 62 can't be determined as moot

1   based on representations made on the record by counsel?

2           MR. TODER:  We can so determine as moot.

3           THE COURT:  Ms. Aanstad, do you concur?

4           MS. AANSTAD:  Yes, Your Honor.

5           THE COURT:  I'm going to take docket number 63 and

6   65 together.  They are motions to retain.  One is to Retain

7   Rough Notes.  That's docket number 63.  And the docket

8   number 65 is Motion to Retain Evidence.  The Government, I

9   believe, does not object, but I don't want to put words in

10  the Government's mouth.

11          MS. AANSTAD:  Your Honor, with respect to

12  retaining any rough notes, the Government does not object to

13  retention but obviously objects to disclosure of any rough

14  notes.

15          With respect to docket number 65, the Motion to

16  Retain Tangible Evidence and Like Materials, the Government

17  does agree at this point in time that it will retain all

18  evidence.  And I would note for the Court that defense

19  counsel talked about a laundry bag that was recovered from

20  the Defendant's vehicle.  I have since learned that that

21  material or that laundry bag was produced to the Defendant

22  himself on, I believe it was, May 14th, 2018.  I have

23  provided all the documentation to Mr. Toder through an

24  e-mail that I sent last week with respect to the whereabouts

25  of that laundry bag.

1           THE COURT:  Mr. Toder, anything that you want to

2     say with regard to 63 or 65?

3           MR. TODER:  Well, my intel was that the laundry

4     bag was picked up by Defendant's mother who was there to

5     pick up all kinds of things out of the vehicle, including

6     sneakers and such.

7           THE COURT:  Well, let's not have a conversation

8     with each other.  Talk to the bench.

9           MR. TODER:  Sorry, Your Honor.

10          THE COURT:  All right.

11          MR. TODER:  This laundry bag issue is extremely

12    important in this case.  The case could very well turn on

13    it.  The laundry bag was found in the back seat of the car.

14    It was filled with women's clothing and it was in that

15    laundry bag that there were some Pringle's boxes and there

16    was most of the subject heroin.  And my client maintains

17    that he has never seen this bag before and we wanted -- the

18    discovery that we talked about, we wanted to be able to test

19    that for DNA or fingerprints in there, whatever.  So we were

20    surprised to find out that it disappeared.

21          I think the Government is going to let us retain

22    their rough notes because later on that could come up.  If

23    no one can talk about what was in the laundry bag and what

24    was done to it before it was removed, that may be important.

25    But for purposes of what we're doing today, the Government

 1    has agreed to retain rough notes so we're not going to

 2    pursue that argument.  And as I understand, the laundry bag

 3    is gone.  So the horse being out of the barn, it appears

 4    that 65 is also moot now then.

 5               THE COURT:  Well, but you have been provided with

 6    the evidence receipts that show when the materials were

 7    released.  I understand that's what -- at least maybe that's

 8    what I understood the Government's position to be.

 9               MR. TODER:  That would --

10               THE COURT:  That was in May of 2018.

11               MR. TODER:  I don't recall any specific document

12    that shows this laundry bag went somewhere.

13               THE COURT:  Well, if it's been provided and you

14    misplaced it, then I'm sure Ms. Aanstad would provide you

15    with a duplicate set of those documents.  You might want to

16    check again and let her know if you've got it or not.

17               MR. TODER:  I will.

18               THE COURT:  Okay.  But otherwise you're

19    withdrawing docket number 65?

20               MR. TODER:  Yes.

21               THE COURT:  Okay.

22               MS. AANSTAD:  And, Your Honor, if I may, just so

23    the record is clear, I will speak with Mr. Toder after this

24    hearing with respect to the e-mail that was sent last week

25    on Monday -- excuse me -- Tuesday that included not only the

1    receipt, the Becker County release of property receipt that

2    was signed by the Defendant himself, but also a screenshot

3    of a text message, which in essence could be rough notes,

4    that was sent by Investigator Luke Sweery (phonetically

5    spelled) to Investigator Peter Loomey (phonetically spelled)

6    and Investigator Skoog when these items were released to the

7    Defendant.

8            And finally I sent an e-mail that was sent by the

9    receptionist at the Becker County Sheriff's Office that

10   indicated that the Defendant was present and wanted to get

11   items out of his vehicle which had been seized on April 12th

12   of 2018 and was going to be forfeited in the state process.

13           THE COURT:  And those were attachments to the

14   Tuesday, last Tuesday's e-mail?

15           MS. AANSTAD:  Yes.

16           THE COURT:  So Mr. Toder can look for that.  If he

17   can't find it, you can send it to him again, right?

18           MS. AANSTAD:  Yes, Your Honor.

19           MR. TODER:  That's true.

20           THE COURT:  All right.  So in terms of the

21   production issue, it seems that the Government has provided

22   you with what it has responsive to docket number 65.  What

23   effect that has, what it -- you know, the admissibility,

24   that kind of -- those are for -- in fact will be argued at

25   another date prior to trial, you know, I imagine in terms of

1    Motions in Limine if they are relevant or not.  But that's

2    not a production issue.  Do you disagree or agree?

3              MR. TODER:  I agree.

4              THE COURT:  All right.  So number 65 is still

5    withdrawn?

6              MR. TODER:  It is.

7              THE COURT:  Okay.  Docket number 64 is the

8    defense's Motion for Production of Materials that fall under

9    *Brady*.  There's not a specific *Giglio* motion but the

10   Government referenced *Brady* materials and *Giglio* materials

11   in its response.  So it looks to me like there might have

12   been some supplemental discussions in the meet and confer

13   that weren't part of the written motion.  So tell me what's

14   what.

15             MR. TODER:  The Government agrees that seven days

16   before trial it promises to provide -- promises -- or

17   whatever it is giving to perspective witnesses seven days

18   before trial.

19             THE COURT:  So that's *Giglio* impeachment

20   materials?

21             MR. TODER:  Yes.

22             THE COURT:  And it's references to those witnesses

23   who are going to actually appear at trial that, Ms. Aanstad,

24   that's what I understood the Government's response to be.

25             MS. AANSTAD:  Witnesses that would --

1          THE COURT:  Yeah.

2          MS. AANSTAD:  Yes.

3          THE COURT:  And the *Brady* materials, the

4    Government acknowledges that if it's exculpatory in nature,

5    it has an immediate and ongoing duty to produce those.

6          MS. AANSTAD:  Yes, Your Honor.

7          THE COURT:  All right.  And there was no specific

8    reference to *Giglio* materials in docket number 65, but we're

9    not fighting about that, right?  I mean 64, I'm sorry.

10         MS. AANSTAD:  No.

11         THE COURT:  You're not objecting to the *Giglio*

12   production on that basis?

13         MS. AANSTAD:  No.

14         THE COURT:  Okay.  All right.  Docket number 67 is

15   the Defendant's Motion for 404(b) Notice.  The -- again, the

16   materials submitted to the Court suggest a meet and confer

17   has resulted in an agreement between the parties.  With

18   regard to docket number 67, it was 404(b) notice ten days

19   before trial.

20         The Court had a question, because a similar motion

21   for Defendant number 1, there was an agreement to produce

22   those materials 14 days before trial.  Is there any reason

23   why this one can't be 14 days before trial as well?

24         MS. AANSTAD:  No, Your Honor.

25         THE COURT:  Okay.

1            MS. AANSTAD:  The Government will agree to make

2       such disclosure.

3            THE COURT:  Mr. Toder, do you object to an extra

4       four days?

5            MR. TODER:  No, Your Honor.

6            THE COURT:  Okay.  That's all the discovery and

7       production motions.  I think I've touched them all.  Have I

8       missed any?

9            MS. AANSTAD:  No, Your Honor.

10           THE COURT:  Mr. Toder?

11           MR. TODER:  No, Your Honor.

12           THE COURT:  Okay.  Then that leaves docket number

13      66, Defendant Jackson's Motion to Suppress Statements

14      obtained on April 12th, 2018.  Is the Government ready to

15      proceed?

16           MS. AANSTAD:  Yes, Your Honor.

17           THE COURT:  All right.  Call your first witness.

18           MS. AANSTAD:  Your Honor, the Government has one

19      witness, Investigator Kristopher Larson.

20           THE CLERK:  Raise your right hand.  You do

21      solemnly swear that in the testimony you're about to give

22      now before the Court to be the truth, the whole truth, and

23      nothing but the truth, so help you God?

24           (No audible response.)

25           THE CLERK:  Once seated, please state your full

1    name and spell your last name.

2             THE WITNESS:  Kristopher Douglas Larson.

3    L-a-r-s-o-n.

4             THE COURT:  Ms. Aanstad, you may inquire.

5                      **DIRECT EXAMINATION**

6    **BY MS. AANSTAD:**

7    Q.  Good afternoon, Investigator Larson.  Because you have a

8    unique spelling to your first name, can you please spell

9    your first name as well?

10   A.  It's K-r-i-s-t-o-p-h-e-r.

11   Q.  Investigator Larson, where are you currently employed?

12   A.  I'm currently employed as an investigator for the White

13   Earth Tribal Police Department in White Earth, Minnesota.

14   Q.  And how long have you been with the White Earth Tribal

15   Police Department?

16   A.  It will be six and a half years, approximately.

17   Q.  How long have you been an investigator with the police

18   department?

19   A.  Just over three years.

20   Q.  Prior to that, with the White Earth Police Department

21   what was your position?

22   A.  I was a patrol sergeant for one year and prior to that I

23   did two years of just active patrol work.

24   Q.  So you started off as a patrol officer, moved to a

25   patrol sergeant, and then an investigator?

1    A.  Correct.  For 18 months I was in Polk County Sheriff's

2    Office as a patrol deputy there.

3    Q.  When was that?

4    A.  It would have been in 2013, March of '13 until October

5    of '14.

6    Q.  So just so I'm clear, there was a break in time at the

7    White Earth Police Department?

8    A.  Correct.

9    Q.  And you then went to the Polk County Sheriff's Office

10   and came back to the White Earth Police Department?

11   A.  Correct.

12   Q.  Now, as an investigator with the White Earth Police

13   Department, what are your duties?

14   A.  My primary duties are facilitation in the investigations

15   of narcotics and/or violent crimes.

16   Q.  And is there a particular area in which you handle those

17   investigations?

18   A.  Most of my investigations lead on the White Earth

19   Reservation or in and around the immediate area to include

20   Mahnomen County, Becker County, Clearwater County.  And then

21   part of the task forces that I serve on, I have a greater

22   range to neighboring counties from there.

23   Q.  Let's talk about that.  You serve on some task forces?

24   A.  Yes.

25   Q.  What task forces do you serve on?

1   A.  I'm on one of the state VCET -- that's Violent Crime

2   Enforcement Teams -- which is Paul Bunyan Drug Task Force

3   out of Bemidji, and I have been on that since December of

4   2015.  And in that same time I'm also deputized with the FBI

5   and U.S. Marshals on the Headwaters Safe Trails Task Force

6   out of Bemidji.

7   Q.  And as a member of those two task forces, both state and

8   federal, what are your duties on those task forces?

9   A.  The investigation of controlled substance trafficking

10  and violent crimes.

11  Q.  Now, that allows you then to also work off of the White

12  Earth Indian reservation; is that correct?

13  A.  That is correct.

14  Q.  Now let's talk a little bit about April 12th of 2018.

15  Were you called with respect to an investigation involving

16  the seizure of suspected heroin and Fentanyl?

17  A.  Yes, I was.

18  Q.  Describe the circumstances as to how you became involved

19  in an investigation on April 12th, 2018.

20  A.  Special Agent Daniel Skoog with the Becker County

21  Sheriff's Office, him and I work alongside each other with

22  the Headwaters Safe Trails Task Force.  He had called me the

23  evening of April 12th and advised that a traffic stop was

24  completed in Motley by a Minnesota state trooper involving a

25  case that had ties to the White Earth Reservation and

1    Detroit Lakes area, and he requested my assistance to come

2    help him in furthering that investigation.

3    Q.  What was going to be your role in assisting furthering

4    that investigation?

5    A.  I was designated to a surveillance car at the Walmart in

6    Detroit Lakes to keep surveillance on an active and ongoing

7    controlled delivery at that facility.

8    Q.  And what is a controlled delivery?

9    A.  Basically agents are aware of a situation or we have

10   seized something and the individual would want to cooperate

11   and deliver those -- what we would call, you know, our

12   controlled substances.  So they would arrange with the

13   parties they were going to deliver it to, and law

14   enforcement would be involved with audio recorders and

15   surveillance to make sure that that delivery was made

16   specific to the instructions given to that co-conspirator

17   defendant.

18   Q.  Now, this controlled delivery, was that based on the

19   traffic stop that you mentioned in Motley, Minnesota?

20   A.  It was.

21   Q.  And were you aware of what occurred during that traffic

22   stop?

23   A.  I am.

24   Q.  What happened?

25   A.  Minnesota State Trooper Nick Otterson had made a traffic

1    stop on a vehicle.  He had multiple reasons for reasonable

2    suspicion to stop the vehicle, and based on his

3    investigation, his partner canine, Boosa (phonetically

4    spelled) would be his canine, did a sniff of the vehicle and

5    alerted to the vehicle; and a subsequent search of that

6    vehicle yielded a large amount of suspected mixture of

7    cocaine and heroin.

8    Q.  Now, that was set for delivery to the Walmart in Detroit

9    Lakes?

10   A.  From what I learned from SA Skoog, the case agent, that

11   was their intended destination, and to deliver -- to meet a

12   female named Dawn from White Earth.

13   Q.  And so then you took part in the surveillance team at

14   the Walmart location?

15   A.  That is correct.

16   Q.  And were you able to identify the vehicle that was --

17   that was part of the controlled delivery that had been

18   stopped in Motley, Minnesota?

19   A.  Yes.  Special Agent Skoog had notified everybody of what

20   the vehicle was, along with a briefing or an operations plan

21   of what was planned on as far as the incident was to go.

22   Q.  And do you remember what that vehicle looked like?

23   A.  I do.

24   Q.  What was it?

25   A.  It was a brand new, or within a few hundred miles of, a

1   black Ford Explorer Limited.

2   Q.  And had that Ford Explorer Limited showed up at the

3   White Earth -- or excuse me -- the Walmart parking lot in

4   Detroit Lakes?

5   A.  Yes, it did.

6   Q.  And you were conducting surveillance at that time?

7   A.  I was.

8   Q.  Was there a vehicle that then approached that black

9   Explorer?

10  A.  Yes, there was.

11  Q.  Do you remember what that vehicle looked like?

12  A.  It was a Pontiac white Grand Prix.

13  Q.  And what occurred after that vehicle pulled up next to

14  the Explorer?

15  A.  I observed a female exit the passenger seat of the

16  Pontiac and enter the rear passenger seat of the black Ford

17  Explorer.

18  Q.  After -- what happened after you made that observation?

19  A.  I continued conducting surveillance from my location

20  until the female passenger that had originally exited the

21  white Pontiac and entered the black Ford Explorer, she then

22  exited the black Ford Explorer and reentered the passenger

23  seat of the white Pontiac.

24  Q.  Were you able to stop the individuals in that white

25  Pontiac?

1    A.  The -- two individuals in the white Pontiac left that

2    location and travelled to the front of the Walmart store and

3    parked, and myself and other law enforcement made contact

4    with them as they were exiting and walking away from the

5    Pontiac.

6    Q.  So just so that I'm clear, the female reentered the

7    Pontiac and then drove across or within the parking lot to a

8    location closer to the Walmart?

9    A.  That's correct.

10   Q.  And so you made contact with the two individuals as they

11   were exiting the Pontiac?

12   A.  Correct.

13   Q.  Did you identify who those individuals were?

14   A.  I did.

15   Q.  Who were they?

16   A.  The driver was Mr. Craig Jackson, Jr. that I also know

17   as "Moose," and the female was identified as Dawn Lee Kier.

18   Q.  Do you see Craig Jackson, Jr. in the courtroom today?

19   A.  Yes, I do.

20   Q.  Could you please identify him by where he's seated and

21   an article of clothing?

22   A.  Mr. Jackson is sitting over here in orange clothing.

23          MS. AANSTAD:  Your Honor, may the record reflect

24   that the witness has identified the Defendant?

25          THE COURT:  The record may so reflect.

1    BY MS. AANSTAD:

2    Q.  Was the Defendant arrested on April 12th of 2018?

3    A.  Yes, he was.

4    Q.  Do you remember what time that was?

5    A.  It would have been right around 8:00 p.m.  I'm not sure

6    the exact time, but I know I set up surveillance at

7    approximately 7:30, shortly after 7:30 p.m.

8    Q.  And so what happened after the Defendant was arrested?

9    A.  He was placed into a Becker County Sheriff's Office

10   marked squad car and was transported to jail.  Myself and

11   other agents had collected some items that were located on

12   the scene, and then I brought those items back to the

13   sheriff's office.

14   Q.  Now, on October -- excuse me -- April 12th, 2018, did

15   you have an opportunity to meet with Craig Steven Jackson,

16   Jr. at the Becker County Sheriff's Office?

17   A.  Yes, I did.

18   Q.  And what was the purpose of meeting with Craig Steven

19   Jackson, Jr.?

20   A.  Special Agent Dan Skoog and I wanted to conduct

21   interviews and Mr. Jackson was one of the persons involved

22   in the case that we wanted to interview.

23   Q.  And did you conduct an interview with the Defendant?

24   A.  Yes.

25   Q.  And where did that interview take place?

1    A.  In the sheriff's office in their dedicated interview

2    room.

3    Q.  And you say "dedicated interview room."  What do you

4    mean by that?

5    A.  They have a small room that is right at the entrance of

6    the jail, the entrance of the jail from the interior side,

7    that is equipped with desk and chairs, a phone, and it

8    has -- it has an old see-through glass window that's not

9    used anymore, and then they have an observation spot on the

10   back side, outside of the room.

11   Q.  That can be then used to look in through that window

12   that you described?

13   A.  Or monitor through the video recording device.

14   Q.  When you say "video recording," do you know whether you

15   video recorded this statement on April 12th, 2018?

16   A.  I do not.

17   Q.  Are you aware of whether it works or not?

18   A.  Typically in the past when I have been present or

19   assisted in interviews, I know that it's been used to

20   monitor them live.  But as far as documenting them or

21   obtaining recordings of them, I don't know.  It's not the

22   office that I work out of.

23   Q.  Are you aware of whether there was an audio recording

24   that was made of the statement with the Defendant on April

25   12th, 2018?

1    A.  Yes, I was.

2    Q.  And there was an audio recording statement?

3    A.  Yes, there was.

4    Q.  Who had the audio recording equipment that was utilized?

5    A.  Special Agent Skoog.

6    Q.  Did you see that recording equipment in that interview

7    room?

8    A.  I don't recall if I observed it.  I just know when he

9    had started the actual recording.

10   Q.  Now, you began to explain the layout of the room.  Could

11   you please describe the interior of the room a little bit

12   more with respect to the size?

13   A.  So when you walk into the room, the doorway is on I

14   believe the left-hand side.  So when you walk into the room

15   it opens up in and to the right, and there's a small desk

16   that goes from against the right wall to the center of the

17   room, and there's a small pathway to be able to walk between

18   the wall and the desk so you can sit at the back side of the

19   desk.  SA Skoog and I sat at the back side of the desk.  On

20   the front side of the desk nearest the door to enter the

21   room is where Mr. Jackson sat.

22   Q.  Was Mr. Jackson, the Defendant, in custody at the time

23   that he was brought into that interview room?

24   A.  Yes, he was.

25   Q.  Do you remember how Mr. Jackson arrived in the room?

1    A.  Mr. Jackson was brought down to the interview room by

2    corrections staff from the jail.

3    Q.  Do you remember what Mr. Jackson was wearing at the

4    time?

5    A.  I don't specifically remember if Mr. Jackson was still

6    in his street clothes or if he had been changed out into

7    jail uniforms.

8    Q.  Do you know whether Mr. Jackson, the Defendant, was in

9    handcuffs at the time?

10   A.  Yes, he was.

11   Q.  Did the Defendant remain in handcuffs during the course

12   of the statement?

13   A.  He did.

14   Q.  Now, this interview, were you in the room from the

15   moment the Defendant entered the room?

16   A.  Yes, I believe I was.

17   Q.  Did you ever leave the room during the course of the

18   interview with the Defendant?

19   A.  No.

20   Q.  What about Agent Skoog.  Was he in the room at the time

21   that the Defendant arrived?

22   A.  I believe so, yes.

23   Q.  And did Agent Skoog ever leave the room?

24   A.  No.

25   Q.  Was there any other individuals that were present in the

1    interview besides you, Agent Skoog and the Defendant?

2    A.  I do not believe there was.

3    Q.  All of the interview statement with the Defendant was

4    captured on recording?

5    A.  That's correct.

6    Q.  And you've had an opportunity to review that recording?

7    A.  Yes, I have.

8    Q.  Now, do you remember what time the interview started?

9    A.  I believe the interview started at approximately 10:16

10   p.m.

11   Q.  And how long did the interview last?

12   A.  I believe it was just over 17 minutes.

13   Q.  What happened when the interview concluded?

14   A.  At the conclusion of the interview, a call was made to

15   the jail and advised that Mr. Jackson would be coming back

16   up.  As was standard interview process that we do at that

17   office, we open up -- there's an electronic door you have to

18   open with a key fob.  The jail is -- the elevator is opened

19   and whoever you're speaking with that's going back up to the

20   jail would go into the elevator and the doors would close

21   and they would go up by themselves where the jail staff

22   would be waiting.

23   Q.  And this door that you described with the key fob and

24   the elevator, that's separate from the door to the interview

25   room?

1    A.  Correct.  It's on the opposite side of the hall.

2    Q.  So let's talk about that 17-minute statement that you --

3    the 17-minute period of time that you talked to the

4    Defendant.  During the course of that interview, did you

5    have a firearm with you at the time?

6    A.  I did.

7    Q.  Where was your firearm located?

8    A.  My firearm was concealed behind my back.

9    Q.  What do you mean behind your back?

10   A.  I wear plain clothes.  I'm not assigned to uniform duty

11   so I wear plain street clothes as part of my undercover

12   priorities and job duties.  So with that being said, I carry

13   very deep concealed with my firearms so it is not able to be

14   detected that I'm carrying.

15   Q.  And did you ever display that firearm to Mr. Jackson in

16   that 17-minute interview?

17   A.  No, I did not.

18   Q.  What about Agent Skoog.  Are you aware of whether he had

19   a firearm?

20   A.  I don't know if he did or not.  I can't say.  Typically

21   Agent Skoog would also carry quite concealed.  So -- but I

22   can't say for certain if he had one or not.

23   Q.  You never saw Agent Skoog display a firearm or point it

24   at Defendant during the course of this statement?

25   A.  No.

1   Q.  Now, during the course of this statement as it began,

2   you indicated that you're familiar with the Defendant.  Is

3   that correct?

4   A.  That's correct.

5   Q.  And at the beginning of the statement, was there any

6   information that was provided by the Defendant?

7   A.  Just his full name, date of birth, and an address.

8   Q.  And are you aware of whether you yourself or Agent Skoog

9   provided the Defendant with a Miranda warning?

10  A.  Yes, Special Agent Skoog did.

11  Q.  And you were there for that Miranda warning?

12  A.  I was.

13  Q.  Did Mr. Jackson agree to speak with you and Agent Skoog

14  on April 12th, 2018?

15  A.  He did.

16  Q.  And you then continued on with the statement?

17  A.  That's correct.

18  Q.  Now, you -- did you and Agent Skoog both ask questions

19  during this interview?

20  A.  We did.

21  Q.  And you had an opportunity to listen to the questions

22  provided by Agent Skoog and the responses from the

23  Defendant.  Is that correct?

24  A.  That is correct.

25  Q.  You also asked questions of the Defendant?

1    A.  Yes.

2    Q.  Did the Defendant appear to understand the questions

3    that were being asked?

4    A.  Yes.

5    Q.  Did the Defendant respond appropriately?

6    A.  Yes.

7    Q.  Did the Defendant volunteer information after agreeing

8    to speak with you and Agent Skoog?

9    A.  Yes.

10   Q.  Did the Defendant appear under the influence of alcohol?

11   A.  No.

12   Q.  Did the Defendant appear to be under the influence of

13   any controlled substances?

14   A.  No.

15   Q.  Did the Defendant complain about not knowing what was

16   going on as he was speaking with you and Agent Skoog?

17   A.  No.

18   Q.  At any point in time during this 17-minutes, did you or

19   Agent Skoog threaten the Defendant in any way?

20   A.  No.

21   Q.  Did you make any promises to the Defendant about whether

22   he would receive any benefits if he spoke to you?

23   A.  No.

24   Q.  Did you make any other promises otherwise to the

25   Defendant during this interview?

1    A.  No.

2    Q.  At any point in time did either you or Agent Skoog raise

3    your voice or yell at the Defendant?

4    A.  No.

5    Q.  Did the Defendant yell at you?

6    A.  No.

7    Q.  Did you or Agent Skoog in any way physically threaten

8    the Defendant during the course of this interview?

9    A.  No.

10   Q.  And at the conclusion of this interview, what happened?

11   A.  At the conclusion of the interview, like normal times

12   when we conclude an interview, the jail is called and

13   advised that Mr. Jackson was -- we were going to put him

14   back up -- head in the elevator to head back upstairs to the

15   jail.  And which so he was walked through the jail sally

16   door and placed into the elevator.

17   Q.  During the course of the statement with the Defendant,

18   did Mr. Jackson ever request an attorney?

19   A.  No, he did not.

20   Q.  Did he ever indicate that he should be talking to an

21   attorney?

22   A.  No.

23   Q.  And again, you were there when Agent Skoog provided a

24   Miranda warning?

25   A.  I was.

1          MS. AANSTAD:  May I approach, Your Honor?

2          THE COURT:  You may.

3    BY MS. AANSTAD:

4    Q.  Investigator Larson, I've placed before you what's been

5    marked for identification purposes as Government Exhibit 1

6    and Government Exhibit 2.  Do you recognize these two

7    exhibits?

8    A.  Yes, I do.

9    Q.  What are they?

10   A.  Exhibit 1 is a CD, compact disc, which contains the

11   audio recording of the statement taken from Mr. Jackson by

12   Agent Skoog and I.

13   Q.  And you've had an opportunity to actually listen to the

14   statement that is on that disc on Exhibit 1; is that

15   correct?

16   A.  Yes, I have.

17   Q.  And you have initialled and dated the disc?

18   A.  Yes.

19   Q.  You listened to that disc today before this court

20   appearance?

21   A.  I did.

22   Q.  And it accurately reflects the statement that you took

23   from the Defendant, you and Agent Skoog, on April 12th,

24   2018?

25   A.  Yes.

1      MS. AANSTAD:  Your Honor, the Government moves to

2   offer Government Exhibit 1.

3          THE COURT:  Mr. Toder.

4          MR. TODER:  No objection for purposes of today's

5   proceedings.

6          THE COURT:  Government Exhibit 1 is admitted.

7   BY MS. AANSTAD:

8   Q.  Next turning to Government Exhibit 2 -- or excuse me --

9   what's been marked or identification purposes as

10  Government's Exhibit 2, what is that?

11  A.  Exhibit 2 is a transcript of the audio recorded

12  statement taken from Mr. Jackson.

13  Q.  And have you had an opportunity to compare Government

14  Exhibit 2, that transcript, to the audio recording in

15  Government Exhibit 1?

16  A.  Yes, I have.

17  Q.  And does that transcript accurately reflect the

18  conversation that was captured on audio recording?

19  A.  Yes, it does.

20          MS. AANSTAD:  Your Honor, the Government moves to

21  admit Government Exhibit 2.

22          THE COURT:  Mr. Toder.

23          MR. TODER:  No objection for purposes of today's

24  proceedings.

25          THE COURT:  Government Exhibit 2 is admitted.

1      MS. AANSTAD:  May I publish, Your Honor?

2      THE COURT:  You may.

3  BY MS. AANSTAD:

4  Q.  Now, wrapping up, Investigator Larson, on April 12th of

5  2018 did the Defendant ever indicate that he did not want to

6  speak with you?

7  A.  No.

8  Q.  Did the Defendant ever indicate that he was confused

9  about why he was speaking with you?

10  A.  No.

11  Q.  Did the Defendant ever indicate that he was confused by

12  the questions that either you or Agent Skoog were asking?

13  A.  No.

14      MS. AANSTAD:  Your Honor, I have no further

15  questions.

16      THE COURT:  Mr. Toder.

17      MR. TODER:  Thank you, Your Honor.

18                    **CROSS-EXAMINATION**

19  **BY MR. TODER:**

20  Q.  Good morning, Mr. Larson.

21  A.  Good morning.

22  Q.  Officer Larson.

23  A.  Good afternoon.

24  Q.  Sorry.  You're right.

25      Did you do anything special in preparing for

1     today's testimony?

2     A.  Just like typical, reviewed the recording and the

3     transcript.

4     Q.  Did you review anything else?

5     A.  I briefly reviewed my own report.

6     Q.  Did you review the grand jury testimony of Officer

7     Skoog?

8     A.  I have not.

9     Q.  Have you ever seen that, a transcript of that?

10    A.  No.

11    Q.  You said that the Defendant was arrested around

12    8 o'clock p.m. on April 12th?

13    A.  I believe that's right around then, that timeframe.

14    Q.  Was he continuously in custody from then until you

15    concluded the interview on April 12th?

16    A.  Yes, I believe so.

17    Q.  And you also said that the Defendant was transported to

18    the Becker County Jail after he was arrested?

19    A.  That's what I believe, yes.

20    Q.  Were you in that vehicle?

21    A.  No.

22    Q.  You testified that the only thing that the Defendant

23    said before he was Mirandized was just his full name, date

24    of birth, something to that effect?

25    A.  Yeah, full name, date of birth, PO box number and phone

1    number.

2    Q.  So you have Exhibit 2 in front of you?

3    A.  I do not.

4         THE COURT:  It's up here.  If you want it, it's

5    right here.

6    BY MR. TODER:

7    Q.  Officer Larson, did the Defendant tell you that he got

8    paid to give Ms. Kier a ride to Walmart?

9    A.  For the ride?

10   Q.  Yeah.

11   A.  Not that I can remember.

12   Q.  All right.  And when he was arrested, there was on his

13   person about a gram of heroin, was there not?

14   A.  I don't know the exact weight but it was around that,

15   yeah.

16   Q.  Um-hum.  And you asked him how much he had paid for that

17   in the interview, correct?

18   A.  Um-hum.

19   Q.  I'm sorry, is that a yes?

20   A.  I'd have to review here first.

21   Q.  I'll direct you to page 4, please.  Line 38

22   specifically.

23   A.  Yep.

24   Q.  And so you're -- if you look at line 41, it's

25   interesting.  You said -- and by the way, KL, that's you?

1   A.  Yes, that's me.

2   Q.  You said to Defendant, "You had told me something out

3   there, too."  So what does that mean, "You had told me

4   something out there, too?"

5   A.  Mr. Jackson, when he was in the rear patrol or in the

6   rear seat of one of the deputy's patrol cars, while he had

7   been placed in there and was talking had made a mention of

8   where that came from when the item was pulled off of him,

9   but I don't remember verbatim what he said.

10  Q.  You were in the vehicle with him, I take it?

11  A.  No, I was outside the vehicle.

12  Q.  Well, it said so, but you were talking through the glass

13  or the window?

14  A.  I think the door was opened.  I mean, I don't know if he

15  was still being searched and placed inside or not.

16  Q.  But you were talking to him?

17  A.  Yeah.

18  Q.  And did you Mirandize him then?

19  A.  I did not.

20  Q.  But he was in custody, was he not?

21  A.  Yes.

22  Q.  What else did he tell you other than that he paid about

23  a hundred bucks for the heroin that was on him?

24  A.  I don't remember what else, if anything else, was said.

25  Q.  Well, what is it?  You don't remember or you think he

1    could have told you more?

2    A.  I don't.  As of that time it was briefly brought him to

3    the car, he had said he wants to help himself out or

4    something like that.  But that's all that I remember

5    was said.

6    Q.  When he said he wanted to help himself out, did you

7    agree that that would be a good thing to do?

8    A.  I don't believe I gave him much of a response at all.

9    Q.  Well, how much of a response did you give him?

10   A.  I don't know.  I can't recall the conversation.

11   Q.  Who was there present that could have heard that

12   conversation besides you and the Defendant?

13   A.  There was a deputy standing close by, too, I think.

14   Q.  Do you know who the deputy was?

15   A.  I'd have to review the reports.  I don't -- whatever

16   deputy's patrol vehicle that was.

17   Q.  At that time did that deputy Mirandize my client?

18   A.  Not that I know of.

19   Q.  Can you be more specific about what you thought he told

20   you when he was in that car?  Or what you thought he told

21   you?

22   A.  I'm just taking a minute here to try to recall the --

23   Q.  Please do.  Take your time.

24   A.  I don't know more of how to clarify other than he was in

25   the back seat of the car and he was wanting to talk.  He was

1    trying to help him say something or because of the

2    situation, and I know I can't clarify, I don't remember

3    exactly what was all said, which he said.  He had began

4    talking with myself.

5    Q.  How many minutes was your conversation with my client?

6    A.  Very short, because we still have an active scene with

7    the parking lot blocked off and people roaming around

8    through Walmart.  So it was pretty fast paced trying to get

9    the things cleared up.

10   Q.  Earlier in your testimony today you said that someone

11   told you that they were going to meet a female named -- I

12   can't remember --

13   A.  Dawn.

14   Q.  Dawn.  Who said that to you?

15   A.  SA Skoog had told me that from his investigation

16   assisting on the traffic stop investigation by Trooper

17   Otterson.

18   Q.  So where was he when he said that they were going to

19   meet a female named Dawn?

20   A.  It was over the phone that Agent Skoog had told me that,

21   so I don't know where -- if he was at the traffic stop

22   location or where -- where those other two defendants were

23   at the time, I don't know.

24   Q.  Did he also say that they were going to meet a male

25   named Craig Jackson?

 1    A.  No.

 2    Q.  Only Dawn, correct?

 3    A.  That's all that SA Skoog told me was a female named

 4    Dawn.

 5    Q.  I'm going to read a sentence to you from the grand jury

 6    testimony of Mr. Skoog.  He says to the grand jury:

 7    "Jackson said that he was driving Kier down from White Earth

 8    to Walmart and that they had met with Pirtle and Williams."

 9         Did anyone ever tell you that Jackson said that

10    they had met with Pirtle and Williams?

11    A.  Can you rephrase that for me?  I'm not following you.

12    Q.  I'll read the sentence again.

13         MS. AANSTAD:  Objection, Your Honor.

14         MR. TODER:  Your Honor, may I approach?

15         THE COURT:  Well, hang on.  What's the objection?

16         MS. AANSTAD:  Your Honor, this is improper

17    impeachment.  It's with a statement, the grand jury

18    testimony of another agent which the investigator has

19    already indicated he has not reviewed and would have no

20    knowledge of.

21         THE COURT:  Mr. Toder, your response to that

22    objection?

23         MR. TODER:  My response is that this is one

24    sentence that was said by Mr. Skoog for purposes of

25    impeaching this witness.  We have it here because Mr. Skoog

1    was supposed to testify and therefore it's not a secret

2    document anymore.

3              THE COURT:  Well, but it's -- the point is it's

4    statements made by someone else to which this person has

5    already testified they have no knowledge of.  So how is that

6    impeaching?

7              MR. TODER:  Your Honor, I can rephrase the

8    question to cure the problem.

9              THE COURT:  Let's try that.  The objection is

10   sustained.  Restate the question.

11             MR. TODER:  I'm going to restate the question.

12   BY MR. TODER:

13   Q.  Just tell me if you agree with this statement.  That at

14   some point Jackson said that he was driving Kier down from

15   White Earth to Walmart and that they had met with Pirtle and

16   Williams.  Did Jackson, Mr. Jackson, did he ever tell you

17   that they, meaning him and Dawn, were driving to

18   specifically meet with Pirtle and Williams?

19             MS. AANSTAD:  Objection, Your Honor.  I renew my

20   previous argument.

21             THE COURT:  All right.  Well, the witness has

22   already said that he wasn't aware of the content of

23   Mr. Skoog's grand jury testimony so his knowledge of that is

24   specifically to what took place in the grand jury, he's

25   disqualified -- he's already said he has no knowledge of

1     that so there's no way to answer that question.  As I

2     understand your rephrased question is you're making it more

3     general, have you ever heard this statement at any time.  Is

4     that what you're saying?

5              MR. TODER:  Yes, Your Honor.  I'm taking it out of

6     the grand jury context.

7              THE COURT:  Okay.  All right.  Well, then ask it

8     that way.

9              MR. TODER:  Okay.  I'll try again.

10             THE COURT:  You keep referring back to the

11    testimony in front of the grand jury.  That's where there's

12    a problem here.  He can't testify to something he wasn't

13    part of and he's already disqualified himself from that.  So

14    go one more time.

15             MR. TODER:  Okay.

16    BY MR. TODER:

17    Q.  Did Mr. Jackson ever tell you that he and Dawn Kier had

18    met with Pirtle and Williams?

19    A.  Mr. Jackson told me that he just drove Dawn to Walmart.

20    Q.  Thank you.

21             MR. TODER:  I have nothing further, Your Honor.

22             THE COURT:  Ms. Aanstad?

23             MS. AANSTAD:  Just briefly, Your Honor.

24

25

1              **REDIRECT EXAMINATION**

2     **BY MS. AANSTAD:**

3     Q.  Investigator Larson, you were at the Walmart store on

4     April 12 of 2018 and assisted in the arrest of the

5     Defendant; is that correct?

6     A.  That's correct.

7     Q.  And there was some questions about whether you spoke

8     with the Defendant at the Walmart scene; is that correct?

9     A.  Correct.

10    Q.  And you assisted in the actual physical arrest of the

11    Defendant?

12    A.  Yes, that's correct.

13    Q.  Did you pose any questions to the Defendant at that

14    time?

15    A.  No, not that I believe.

16    Q.  Did you attempt to take a statement from the Defendant

17    by -- at that time?

18    A.  No.

19    Q.  Was the Defendant saying things to you?

20    A.  Yes.

21    Q.  Did you then engage in a conversation with the

22    Defendant?

23    A.  I don't believe anything more than potentially we would

24    sit down and talk at a later time.

25    Q.  And how long was your interaction with the Defendant as

1    you were arresting him?

2    A.  Long enough to place him into handcuffs and search his

3    person or assist in searching his person; and from the time

4    he was put into a squad car, because we had a deputy that

5    had pulled up, and then that brief moment at the open door

6    of the squad car when he was trying to speak with me.  So

7    not long at all.

8    Q.  And the Defendant was transported to the Becker County

9    Sheriff's Office by a deputy from Becker County?

10   A.  Yes.

11   Q.  And you had no other interaction with the Defendant

12   until you met him in that interview room at the Becker

13   County Sheriff's Office?

14   A.  That's correct.

15   Q.  Now, after arresting the Defendant at the Walmart

16   location, there was a period of about an hour and a half to

17   two hours?

18   A.  That's correct.

19   Q.  And during -- when you saw the Defendant again at the

20   interview room at the Becker County Sheriff's Office, did

21   you note any injuries on the Defendant?

22   A.  I knew of none.

23   Q.  Did the Defendant complain to you at all about his

24   treatment between the time of his arrest and when you saw

25   him again at the Becker County Sheriff's Office?

```
1    A.  No.

2    Q.  And when you indicated that the Defendant told you that

3    he had driven Dawn to the Walmart in Detroit Lakes,

4    Minnesota, when did the Defendant tell you that statement?

5    A.  That was in the interview room at the sheriff's office.

6              MS. AANSTAD:  Thank you.  I have no further

7    questions.

8              MR. TODER:  Nothing further, Your Honor.

9              THE COURT:  All right.  Do you want to -- either

10   of you want to retrieve Exhibit 2 and give it back to the

11   Court?

12             MS. AANSTAD:  Yes, Your Honor.

13             Your Honor, may this witness be excused?

14             THE COURT:  He may.

15             MS. AANSTAD:  Your Honor, the Government rests.

16             THE COURT:  Mr. Toder.

17             MR. TODER:  We have no witnesses and we'll rest.

18             THE COURT:  All right.  Do the parties wish the

19   opportunity to brief the motion?  Government, what's your

20   preference?

21             MS. AANSTAD:  Your Honor, I guess it depends upon

22   what defense counsel -- based upon --

23             THE COURT:  I guess I should ask Mr. Toder first.

24             MR. TODER:  No, Your Honor, we'll submit this on

25   the record.
```

1          THE COURT:  And -- okay.  Which gets me to a --

2     have a seat.

3          Do you want to make an argument now today, you

4     know, before we adjourn?  Or when you say on the record, I

5     mean, just silent and let me take it from here?

6          MR. TODER:  No, Your Honor, I think the record

7     speaks for itself.  His testimony speaks for itself.  In a

8     nutshell, the part about the -- him having a gram of heroin

9     on him and how it was paid for, that's a very critical part

10    of the case and that information was obtained from the

11    Defendant while he was in custody without him being

12    Mirandized.  And just because he says later on in a

13    Mirandized statement, that doesn't cleanse the problem that

14    happened there.  And therefore, I would at least like any

15    mention at all about the compensation for the heroin and all

16    that thing be stricken.  But I'd like the whole thing

17    stricken, of course.

18          THE COURT:  Okay.  Ms. Aanstad.

19          MS. AANSTAD:  Your Honor, based upon the

20    Defendant's motion, the Government would request that the

21    Court deny the Defendant's Motion to Suppress.  This is an

22    issue of whether the statement was voluntarily given and a

23    Miranda warning was provided.  The evidence will speak for

24    itself.

25          Both Government Exhibits 1 and 2 outline the

1   statement that was taken from the Defendant on April 12th,

2   2018, and Investigator Larson has testified with respect to

3   that statement as well as the Defendant's arrest

4   approximately two hours before.

5          So based upon all of the evidence in this case,

6   the Government would move to -- would respectfully request

7   that the Court deny the Defendant's Motion to Suppress.

8          THE COURT:  This case is presently set for trial

9   on March 4th, 2019.  Even taking the motion under advisement

10  today with time to prepare a report and recommendation,

11  which obviously we can get to work on it as soon as our

12  workload permits and not have to wait for any briefing, but

13  that still leaves opportunities to object and respond to

14  objections a total of 28 days after that.  That will have

15  the necessary effect of under rule -- Local Rule 12.1 of

16  essentially kicking that trial date down the road a little

17  bit because I can -- I mean, even if I turn this tomorrow,

18  those objection periods take you into the trial date.

19         MS. AANSTAD:  Your Honor, if I may, I believe we

20  received a new trial notice on Friday, I think it was, of

21  April 1st.

22         THE COURT:  All right.  Then I have -- that may

23  still affect it.  I don't know.  But the -- I was given the

24  files before that showed up.  So, okay.  But that's

25  effectively another month.  It may be enough time, I don't

1    know.

2           Well, we will issue our report and recommendation

3    as soon as our current workload permits.  I don't know if

4    anyone intends to order a transcript but I don't intend to

5    wait for the transcript to start working on this since no

6    one wants to brief it or anything like that.  The Court has

7    its notes, the Court has its recollection of the testimony,

8    and if need be I can refresh by pulling up the hearing on

9    the digital recording of the hearing as I need to.

10          Anything else from the defense?

11          MR. TODER:  No, except it is our intention to

12   order a transcript.  That doesn't affect you, I guess.

13   Nothing else.

14          THE COURT:  All right.  Anything else from the

15   Government?

16          MS. AANSTAD:  No, Your Honor.

17          THE COURT:  All right.  All motions are submitted,

18   under advisement.  Discovery and production motions will be

19   subject to order.  We'll get that out here shortly.  Docket

20   number 66, Motion to Suppress, subject to report and

21   recommendation, that will be separately issued, again as our

22   workload permits.

23          We're adjourned.  Thank you.

24          (Court adjourned at 4:17 p.m.)

25                    *      *      *

1

2

3          I, Carla R. Bebault, certify that the foregoing is

4     a correct transcript from the digital audio recording of

5     proceedings in the above-entitled matter, transcribed to the

6     best of my skill and ability.

7

8

9               Certified by:   s/Carla R. Bebault
                                Carla Bebault, RMR, CRR, FCRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25